IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>NICHOLAS CHENIER,<br><br>  Defendant. | 8:19CR30<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on Defendant's Motion to Suppress Evidence. ([Filing No. 16](#).)  A hearing on the motion was held on April 25, 2019, and a transcript of the proceedings was filed on May 17, 2019.  This matter is now ripe for disposition.

For the reasons explained below, it will be recommended that the motion be denied.

**FACTS**

On August 24, 2018, at approximately 9:21 p.m., Omaha Police Detectives Andrew Ramsay ("Detective Ramsay") and Cortes Clark ("Detective Clark") observed a vehicle driven by Defendant near 45th and Bedford Street in Omaha, Nebraska. (TR. 11.)  Detectives Ramsay and Clark are both assigned to the Omaha Police Department's gang unit. (TR. 10; TR. 75.)  Detective Ramsay has been with the Omaha Police Department for approximately seven years and has been a gang unit officer for a year-and-a-half. (TR. 75.)  Detective Clark has been employed by the Omaha Police Department for almost four years and has been a gang unit officer for approximately eight months. (TR. 9-10.)

Detective Clark testified that he observed the vehicle driven by Defendant fail to properly signal a traffic move.[1] (TR. 11.)  Detective Clark further testified that he observed the vehicle

---

[1] Defendant failed to signal his intent a hundred feet prior to his turn in violation of [Neb. Rev. Stat. § 60-6,161](#). (TR. 11, 76-77.)  The detectives saw him do this on at least two occasions. (TR. 12, 76-77.)

perform evasive maneuvers by making arbitrary turns and not taking direct routes to get to particular destinations. (TR. 16-18.) Detective Clark further testified that he believed Defendant knew the detectives were behind him during this time. (TR. 17.)

The detectives activated the police cruiser's emergency lights and initiated a traffic stop at approximately 36th and Ames Street.[2] (TR. 19; Ex. 1.) Detective Ramsay made initial contact with Defendant and his passenger, Brittani Garrison ("Garrison"). (TR. 22-23.) Detective Ramsay approached the vehicle on the passenger's side and asked Defendant for the vehicle registration. (TR. 77.) He also requested Defendant and Garrison's identification. (TR. 77.) Garrison was able to produce an ID. (TR. 86; Ex. 1.) Defendant was unable to provide any identification or anything with his name on it. Defendant was able to produce the vehicle registration information, but the vehicle was not registered to Defendant or Garrison. (TR. 77-78, 86; Ex. 1.) During this time, Detective Clark approached the passenger's side of the vehicle. Detective Ramsay then moved to the driver's side and asked Defendant for his name, date of birth, address and social security number. (Ex. 1.)

After collecting this information, Detective Ramsay returned to the cruiser to run a data check on Defendant, Garrison and the vehicle. (TR. 26, 78.) From the video of the encounter, it appears Detective Ramsay began to run these checks immediately when he entered the cruiser. Detective Clark and Detective Ramsey testified that due to Defendant not having any identification, the background checks would take longer. (TR. 25-26, 86.) Detective Ramsay testified that in order to run a data check, officers get information from the occupants and vehicle information. (TR. 77.) Officers then perform a background check on the occupants through a local data system, as well as an NCIC interstate background check using Channel 5 ("Channel 5 check"). (TR. 78.) Detective Ramsay learned through the local data system that that Defendant had a suspended driver's license in Nebraska and that he was a convicted felon for possession of methamphetamine and felon in possession of a firearm. (TR. 29; TR. 78.)

---

[2] A video of the traffic stop was captured by the cruiser video and body cameras worn by both detectives. (Ex. 1.)

When Detective Ramsay returned to the cruiser to run the data check, Detective Clark moved to the driver's side of the vehicle and engaged Defendant in conversation. (Ex. 1.) Detective Clark eventually asked Defendant if there was anything illegal in the vehicle. Defendant responded no. Detective Clark and Defendant then engaged in further conversation about why he was stopped. After this conversation, Detective Clark asked Defendant again if he had anything illegal in the car, to which Defendant again responded no. Detective Clark then asked Defendant if he could search his vehicle. (Ex. 1.) Defendant would not say yes or no. Defendant only responded by saying it was not his vehicle. (Ex. 1; TR. 27.) Detective Clark testified that it appeared Defendant was trying to separate himself from the vehicle, which raised Detective Clark's suspicion. (TR. 27.) Detective Clark also stated that Defendant appeared to be frustrated and nervous, and that Defendant would not make eye contact with him. (TR. 28.) Detective Clark stated that he has seen this type of behavior in individuals who are trying to elude something in a vehicle. (TR. 28.) Due to Defendant's behavior, Detective Clark thought there may be something in the vehicle. (TR. 29.)

When Detective Clark returned to the cruiser, he inquired as to a K-9. Following Detective Clark's inquiry, Detective Ramsay requested a K-9. (Ex. 1.) This occurred approximately eight minutes into the traffic stop. (Ex. 1.) Detective Clark then asked Detective Ramsay about Defendant's criminal record. (Ex. 1.) Detective Ramsay informed Detective Ramsay that Defendant was a felon who had convictions for drug and gun charges. (Ex. 1.)[3]

Detective Ramsay explained to Detective Clark that he still did not have Defendant's Iowa record check back because he had to call it in to Channel 5. (Ex. 1.) Detective Ramsay also stated that he still had to perform a background check on Garrison. (Ex. 1.) Detective Clark then returned to Defendant's vehicle to remove Defendant and Garrison from the vehicle. (Ex. 1.) At that point, Detective Ramsay radioed in a Channel 5 check. (Ex. 1.) The Channel 5 check began

---

[3] The Court notes that Detective Clark's testimony was different at the hearing. Detective Clark testified that when got back to the cruiser, Detective Ramsey told him Defendant's criminal history and then Detective Ramsey called for a K-9. (TR. 29.) Detective Clark does indicate in his testimony that he "thinks" this is what happened. So, it appears Detective Clark may have simply been mistaken as to the order of events. (TR. 29.)

approximately nine minutes into the traffic stop and approximately five minutes after Detective Ramsey had starts the local checks on his computer. (Ex. 1.)

When Detective Clark returned to Defendant's vehicle, he asked Defendant multiple times to exit the vehicle. (TR. 31; Ex. 1.) Defendant said no and refused. (TR. 31.) Defendant questioned why he had to exit the vehicle. (TR. 31.) Detective Clark testified that he told Defendant he was under arrest for driving during suspension.[4] (TR. 31.) Defendant eventually exited the vehicle and Detective Clark performed a pat-down search. (Ex. 1.) Detective Clark testified that Defendant became somewhat aggressive and tried to resist Detective Clark's efforts to place him in handcuffs. (TR. 31-32.) It also appears from the video that Defendant was not following the officers' commands. (Ex. 1.) Detective Ramsay returned to Defendant's vehicle as Defendant was being placed in handcuffs due to the Defendant not following Detective Clark's commands. (TR. 81; Ex. 1.) At that point, the Channel 5 check was still not complete.[5] (TR. 78-79.) As Defendant was being placed in handcuffs, K-9 Officer Pignotti arrived on the scene with his K-9. Officer Pignotti first appears on the video of the encounter around ten minutes into the traffic stop.

---

[4] The Court notes that the video, Exhibit 1, does not reflect that Detective Clark ever told Defendant he was under arrest. Detective Clark told Defendant he had to sign a citation. It is unclear to the Court whether this is in reference to driving under suspension or the traffic infraction. Either way, the detectives had the right to require Defendant to exit the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106 (1997). Given Defendant's behavior and criminal history, it was appropriate for the detectives to place Defendant in handcuffs for officer safety. *See United States v. Harvey*, No. 14-00029-11-CR-W-GAF, 2015 WL 1197918, at *5 (W.D. Mo. Mar. 16, 2015) ("[W]hile handcuffing an individual during a traffic stop may not be the norm, police officers engaged in an otherwise lawful stop must be permitted to take measures—including the use of handcuffs—they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others") (internal quotation omitted).

[5] The Channel 5 check did not come back until approximately 16 minutes and 8 seconds into the traffic stop. (Ex. 1, TR. 85.) This was after the K-9 had alerted and indicated on the vehicle and the search of the vehicle had already begun. (TR. 79-80; Ex 1.) The detectives learned through the Channel 5 check that Defendant's Nebraska driving record showed his license was expired, revoked, suspended with an order to surrender to Iowa for violation of a child support order. Defendant's Iowa driving record showed he was barred and a habitual offender. (Ex. 1; TR. 88.)

4

Once Defendant and Garrison were in handcuffs, they were moved to the side of the street. (TR. 30; Ex. 1.)  The K-9 then performed a clean air sniff and indicated to narcotics in the vehicle. (TR. 35; Ex. 1.)  Officers then began to search the vehicle. (Ex. 1.)  Officer Pignotti located what appeared to be methamphetamine under the panel close to the vehicle's center console and gear shift. (TR. 36.)

## DISCUSSION

### 1.    Traffic Stop

Defendant did not challenge the traffic stop in his motion or directly in his brief. Defendant's attorney indicated at the evidentiary hearing that he was, in fact, challenging the stop. Defendant's counsel explained that he could not really discuss the validity of the stop in his brief because there was no video of the alleged violations.  Defendant's attorney indicated that he needed to question the officers about the traffic stop before he could make any arguments regarding the validity of the stop.  The Court allowed this issue to go forward. (TR. 5-7.)

"A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." *United States v Andrews* 454 F.3d 919, 921 (8th Cir. 2006). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*.

Defendant was pulled over for failure to signal his intent a hundred feet prior to his turn in violation of Neb. Rev. Stat. § 60-6,161.  Both detectives testified that they saw him do this on at least two occasions.  Defendant suggests that his stop was pretextual.  However, "[c]ourts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones,* 275 F.3d 673, 680 (8th Cir. 2001).  Based on the evidence presented at the hearing, the Court finds that the detectives had probable cause to believe Defendant had committed a traffic infraction. Therefore, the traffic stop was valid.

5

### 2. Duration of the Stop and Reasonable Suspicion

Defendant's primary argument is that all evidence obtained as a result of the search of the vehicle should be suppressed because law enforcement unlawfully, without reasonable suspicion, extended the traffic stop in order to obtain a K-9 sniff. The Court finds Defendant's arguments unpersuasive.

"After a law enforcement officer initiates a traffic stop, the officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (internal quotation omitted). These tasks generally include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (quotation omitted). Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates reasonable suspicion to justify a further detention. *See United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998). "A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and is not "an ordinary incident of a traffic stop." *Rogriguez*, 135 S.Ct. 1609, at 1615. Therefore, "an officer who has stopped a driver for a traffic-related violation may not extend the stop for a dog sniff absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *United States v. Nabavi*, No. 4:16CR3039, 2017 WL 1207877, at *5 (D. Neb. Feb. 13, 2017) (internal quotation omitted).

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime [is] being committed." *Beck*, 140 F.3d at 1136 (quotation omitted). Courts may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Id*. "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994).

6

As discussed above, the detectives initiated a valid traffic stop of the vehicle for failing to properly signal a traffic move. Therefore, the detectives were allowed to perform routine checks, including running a criminal background check on the occupants. When the K-9 arrived on the scene, approximately ten minutes into the stop, the traffic stop had not been completed. Officers were still waiting for the Channel 5 check to return on both Defendant and Garrison. There is nothing that indicates that officers used delay tactics to extend the stop in order to obtain a K-9 sniff. Officers were still completing the purpose of the traffic stop at the time the K-9 arrived. The detectives testified, and the video reflects, that the checks would take longer than normal because Defendant did not have identification. As it turned out, Defendant was driving on a suspended driver's license. Due to the K-9 sniff occurring during the traffic stop and the stop not being extended in any way for that purpose, the dog sniff is valid. *See Illinois v. Caballes*, 543 U.S. 405 (2005); *United States v. Fuehrer*, 844 F.3d 767 (8th Cir. 2016).

Defendant argues that the stop was prolonged because officers could have asked for an RB number and started writing the ticket much sooner than they did. This argument is without merit. Detective Ramsey could not even determine what he was going to do until all the data checks were completed. Defendant did not have any identification. Consequently, Detective Ramsey had to first determine if Defendant was actually who he said he was. Then, Detective Ramsey had to check to see if Defendant had any warrants. Lastly, Detective Ramsey needed to see if Defendant's driving privileges were valid, which they were not. Once all of these checks were completed, only then could Detective Ramsey decide how to proceed.

If one were to find that the stop was prolonged, Defendant contends that reasonable suspicion of criminal activity did not develop during the traffic stop to justify the K-9 sniff. Defendant claims the only reason for the K-9 sniff was his criminal record. The detectives, who are members of the Omaha gang unit and experienced in patrolling high-crime areas, testified that they considered multiple aspects of the traffic stop as suspicious. According to the detectives' testimony, these circumstances included Defendant's evasive driving (TR. 19-20); evasive answers to questions; failure to make eye contact (TR. 28); frustrated and nervous behavior while interacting with officers (TR. 26-29); distancing himself from the vehicle by saying the vehicle did not belong to him (TR. 27; TR. 29); travel in a high-crime area; prior convictions for narcotics

7

and firearms (TR. 29); failure to immediately exit the vehicle when asked to do so (TR. 31); failure to follow the officers' instructions; and resistance to being placed in handcuffs (TR. 31-32).  The Court finds that the totality of these circumstances supports the officers' suspicion of criminal activity.

Detective Clark testified that just prior to the stop, he observed Defendant's vehicle making evasive maneuvers.  Although an officer's "subjective perceptions of the driver's nervous behavior or evasive driving standing alone may not be sufficient to constitute a reasonable, articulable suspicion, when taken with the other factors, they contribute to the suspicion." *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008).  *See United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (stating that "police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive").  In addition to his purported evasive driving, the detectives testified that Defendant was located in a high-crime area and provided evasive responses to questions.  The Eighth Circuit Court of Appeals has found that a suspect's location in a high-crime neighborhood, coupled with nervousness and evasive answers can contribute to an officer's reasonable suspicion.  *See United States v. Atlas*, 94 F.3d 447, 450-51 (8th Cir. 1996) (finding reasonable suspicion where the defendant was located in high-crime neighborhood, appeared very nervous, and gave evasive answers).

Officers were also aware that Defendant had a prior conviction for a drug offense.  Courts have concluded that prior convictions for drug offenses greatly support a finding of reasonable suspicion.  *See United States v. Morales*, Case No. 19-CR-0066, 2019 WL 2357364, at *8 (N.D. Okla. June 4, 2019) (finding the defendant's prior conviction for drug trafficking conspiracy weighed "heavily" in favor of finding that the officer had reasonable suspicion).  Moreover, Defendant repeatedly refused to exit the vehicle as directed by officers.  Once he finally exited the vehicle, Defendant refused to follow commands and cooperate with officers as he was placed in handcuffs and detained.  These facts also support a determination of reasonable suspicion.  *See United States v. Hollins*, 336 F. App'x 921 (11th Cir. 2009) (finding reasonable suspicion during traffic stop where Defendant repeatedly refused to follow officer's commands and refused to follow officer's instruction to exit the vehicle); *Stachowiak*, 521 F.3d at 854, 856-57 (finding reasonable suspicion where the defendant would not cooperate with the officer, refused to exit the

vehicle until the officer threatened to use aerosol restraint, and pulled away from the officer when he exited the vehicle). All these circumstances, taken in combination, support the conclusion that officers had reasonable suspicion to believe that Defendant was engaged in criminal activity. Therefore, the K-9 sniff and subsequent search of the vehicle were lawful.[6]

Accordingly,

**IT IS HEREBY RECOMMENDED** to Senior United States District Court Judge Laurie Smith Camp that Defendant's Motion to Suppress Evidence ([Filing No. 16](#)) be denied.

Dated this 14th day of June, 2019.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

---

[6] The government also argues that the vehicle could have been searched by way of an inventory search because the vehicle Defendant was driving was impounded. According to the government, the evidence would have been inevitably discovered because of the inventory search. Given the Court's other findings, this argument will not be addressed in this order.